IN THE UNITED STATES DISTRICT COURT

CENTRAL DIVISION, DISTRICT OF UTAH

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:04-CR-100 DB |
| Plaintiff, | : | |
| vs. | : | REPORT AND RECOMMENDATION |
| | : | JUDGE DEE BENSON |
| BRUCE McLAUGHLIN and NANCY HALL, | : | MAGISTRATE JUDGE BROOKE C. WELLS |
| Defendants. | | |

This matter is before the Court on Defendants, Bruce Mclaughlin's and Nancy Hall's, Motion to Suppress. Evidence was taken over the course of three days: June 22, 2004, August 3, 2004, and September 16, 2004. Both Defendants were present with counsel. Mr. Mclaughlin was represented by James Bradshaw. Ms. Hall was represented by Fred Metos. The Government was represented by Vernon Stejskal.

Following briefing by the parties, final argument on Defendants' motion was held on May 5, 2005.[1] Prior to the

---

[1] The Court received the transcript from final arguments on May 23, 2005, and then proceeded to take the motion under advisement.

1

hearing, the Court again reviewed the video tape of the traffic stop,[2] and carefully considered the memoranda and other materials submitted by the parties.  Since taking the motion under advisement, the Court has further considered the law, including a recent decision of the Tenth Circuit, U.S. v. Santos, 403 F.3d 1120 (10th Cir. 2005), offered by the Government at oral argument, and facts relating to the motion.  Now being fully advised, the Court enters the following Report and Recommendation.

## I.  BACKGROUND

On February 10, 2004, at approximately 8:30 p.m., Sevier County Deputy Sheriff Bryant Lee Johnson (Deputy Johnson), was parked in a marked vehicle in the median of Interstate 70 near Elsinore, Utah.  (Tr. 9, 14-16).  Deputy Johnson was facing westbound running stationary radar on eastbound traffic.  (Tr. 15).  Deputy Johnson noticed a blue Honda hatchback driving in the far right hand lane which appeared to be going slower than the other vehicles on the interstate.  (Tr. 15-16).  Deputy Johnson activated his radar and determined that the vehicle was traveling at 56 miles an hour (m.p.h.).  (Tr. 16).  The maximum

---

[2]  Deputy Johnson's patrol car was equipped with a video camera which began recording when the Deputy activated his emergency equipment.  The video tape of the stop, and of occurrences after the stop, including the canine sniff, was admitted into evidence during one of the suppression hearings.

speed limit in that area is 75 m.p.h. and the minimum speed limit is 45 m.p.h.  (Tr. 16, 40, 64).

Deputy Johnson testified that there was nothing illegal about traveling 56 m.p.h. on that portion of the interstate although the slower speed did concern him.  (Tr. 16, 40-41). It was dark, wintertime, and there was at least a possibility of ice being on the roadway.  (Tr. 65-66).  Deputy Johnson did not notice any traffic violations, equipment violations or any other abnormal driving characteristics as the vehicle approached and passed the officer.  (Tr. 42, 47, 67, 94).  Deputy Johnson made a U-turn and sped up to follow the vehicle.  (Tr. 16, 42).  The Deputy followed in the left hand fast lane while the Honda traveled in the right lane.  (Tr. 16, 42).  When the Deputy was "just off the corner of the[] back bumper" the car went "onto the white line and traveled on the white line for . . . about a quarter of a mile."  (Tr. 19).  Deputy Johnson admitted that it may have been his action which led the driver to move over the white line.  (Tr 95-96).  Notwithstanding this distinct possibility, Deputy Johnson pulled the vehicle over to check for a sleepy or intoxicated driver.  (Tr. 17).

The driver of the vehicle signaled and pulled over to stop. When the Deputy made contact with the vehicle occupants, he noticed a strong odor of orange air freshener and ashes from an ashtray that were spilled on the floor near the passenger.  (Tr.

3

19-20).  Deputy Johnson saw a bottle of air freshener sitting
inside the door by the driver's seat.  (Tr. 20).  Deputy Johnson
did not notice any odor of controlled substances such as
marijuana, methamphetamine, or cocaine.  (Tr. 49).  There was
also no indication that the ashes came from a controlled
substance.  (Tr. 96).  Approximately 15 minutes later when the
Deputy made further contact with the passenger, the orange air
freshener smell had dissipated.  (Tr. 72, 78, 83).

Deputy Johnson asked for license and registration
information.  The driver of the vehicle, Nancy Hall, asked if she
had been speeding.  (Tr. 22).  The Deputy responded no and asked
her if she was tired because she was driving so slow.  Ms. Hall
was "shaky" and could not find her license although she stated
that she had it.  (Tr. 22).  The Deputy asked Ms. Hall to get out
of the vehicle and return to his patrol car where he questioned
her further.  Deputy Johnson asked questions about the vehicle's
owner, details about the occupants' travel plans, why she had
crossed the white line, and confirmed her license information.
(Tr. 24, 30, 52-53, 73-74; Video 20:33:34).  In response to being
questioned about why she crossed over the white line, Ms. Hall
indicated that she thought the Deputy was pulling her over.
(Video 20:37:20).

Deputy Johnson ran her name and dispatch eventually came
back with a valid driver's license from the state of Oklahoma.

(Tr. 25, 75; Video 20:40:48).  The Deputy also ran a warrants and criminal history check.  (Tr. 30-33, 74).  Ms. Hall had one drug charge on her record.  (Tr. 33).

Deputy Johnson returned to the vehicle leaving Ms. Hall in his car and asked Mr. McLaughlin a series of questions that were similar to those asked of Ms. Hall.  Both Defendants independently confirmed the same story about where they had been and that they had borrowed the vehicle from Mr. McLaughlin's friend.  The Deputy took Mr. McLaughlin's license and ran a warrants and criminal history check.  The background check of Mr. McLaughlin revealed that he had prior drug charges and was on probation out of Colorado.  (Tr. 33; Video 20:57:20).

Approximately, twenty minutes into the stop, Deputy Johnson told Ms. Hall that he had some concerns.  (Video 20:51:22).  These included the orange scent that was strong upon initial contact with the occupants but dissipated shortly thereafter, being "a little slow to pull over," and ashes spilled on the floor.  The Deputy checked Ms. Hall for impairment after she denied his request for permission to search the vehicle.  (Video 20:53:00).  Ms. Hall showed no signs of impairment.  (Tr. 36-37, 60, 76; Video 20:54:05).  Deputy Johnson then called for the K-9 unit to be dispatched and told Ms. Hall that he was going to have a dog go around the outside of the vehicle.  (Tr. 34; Video 20:54:38).  Ms. Hall's refusal to allow the Deputy to search

affected his decision to call for the dog.  (Tr. 34, 59-60).

While waiting for Mr. McLaughlin's background check to come back the Deputy told Ms. Hall "I do believe there's something wrong here don't know yet what it is." (Video 20:55:27).  The Deputy suspected something was going on with drugs and told Ms. Hall that this was based on the things he had seen and his experience.  (Video 20:56:00).  Deputy Johnson gave Ms. Hall a warning citation for the lane change violation.  (Video 20:57:50).  During testimony, Deputy Johnson admitted that he accomplished the purposes of the initial stop at the time he gave Ms. Hall a warning citation.  (Tr. 80-81).  Deputy Johnson then exited his patrol vehicle leaving Ms. Hall inside and returned to question Mr. McLaughlin.  (Video 20:58:05).

Deputy Johnson asked Mr. McLaughlin to step out of the vehicle, patted him down and then asked him for consent to search.  He refused.  (Tr. 34; Video 20:59:40).  The Deputy had dispatch try to make contact with Mr. McLaughlin's probation officer to find out if he had a clause in his probation agreement which forced him to submit to searches.  (Tr. 33; Video 21:04:22).  However, no contact was ever made with the probation officer.  Deputy Johnson gave Mr. McLaughlin a series of tests regarding impairment.  (Video 21:07:17).  Mr. McLaughlin showed no signs of impairment.  (Tr. 37; Video 21:09:50).

The K-9 unit that came at the Deputy's request consisted of

Deputy Todd Gardner, and his dog, Vader.[3]  Deputy Gardner is
employed by the Sevier County Sheriff and is the only K-9 handler
for the sheriff's office.  (Tr. 106-107, 173).  Deputy Gardner
has been in this position since 2003.  Vader was certified to
locate controlled substances on October 17, 2003.  (Tr. 107-108).

Vader was rescued by Deputy Gardner from the Humane Society
in Salt Lake City.  Originally, he was taken home as a pet but
Deputy Gardner "noticed he had some skills in him to be able to
search or work as a police search dog."  (Tr. 108).  Deputy
Gardner testified that Vader had "character drives in him,
instinctive to hunt to find and to search objects.  His toy, his
ball, basically is what I noticed prior to any training, he was
searching all the time for it."  (Tr. 109).

Deputy Gardner alerted Vader by walking around Defendants'
car with a toy.  (Video 21:11:25).  The Deputy then led Vader
around the car using taps on the vehicle to alert the dog to
search a particular point.  (Tr. 38; Video 21:12:10).  Deputy
Gardner also used a distinct high pitched voice to excite the dog
and keep its attention.  (Tr. 172; Video 21:13:42).  Eventually,
Vader allegedly indicated on the passenger side door and Deputy
Johnson conducted a search.  (Video 21:16:00).  The Deputy

_____

    [3]  After receiving extensive testimony, the Court notes that
Vader does not appear to be anything like the powerful Dark Lord
of the Sith, Darth Vader, from the epic saga Star Wars.  In
essence, Vader the dog, appears to be a lovable pet that was
rescued from the Humane Society and put to work as a police dog.

retrieved a bag with a substance in it.   (Video 21:16:40).   Both
occupants were then placed under arrest and the car was impounded
and driven back to the station for a more thorough search.
(Video 21:17:18 - 21:34:00).


## II.  DISCUSSION

A routine traffic stop is "characterized as an investigative
detention" and a seizure within the meaning of the Fourth
Amendment.  U.S. v. Wood, 106 F.3d 942, 945 (10th Cir. 1997).
The reasonableness of an investigative detention is analyzed
under the principles found in Terry v. Ohio, 392 U.S. 1, 19-20
(1968).  A two-part inquiry is required.  First, the Court must
determine "whether the officer's action was justified at its
inception."  United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483
(10th Cir. 1994).  Second, the Court considers "whether the
action was reasonably related in scope to the circumstances that
first justified the interference."  Id.  "An officer conducting a
routine traffic stop may request a driver's license and vehicle
registration, run a computer check, and issue a citation."  Id.
After completing these activities, an officer may detain a driver
for reasons unrelated to the initial traffic stop if (1) the
officer has "an objectively reasonable and articulable suspicion
that illegal activity has occurred or is occurring[,]" or (2) "if

the initial detention has become a consensual encounter." <u>Id.</u>
(citations omitted); <u>see also</u> <u>Terry</u>, 392 U.S. 1 (1968).

In addition to the two-part inquiry, the Court finds that in
the instant case, the Court must also consider the circumstances
surrounding the dog sniff.  Defendants argue that the dog did not
properly indicate on Defendants' vehicle.  Conversely, the
Government argues that their were no problems with the canine
sniff.  The Court received extensive expert testimony from both
Defendants and the Government concerning proper training,
pedigree, proper handling of the police dog, and opinions about
the validity of the canine sniff.  <u>See</u> Gov. Res. p. 3-11; Def.s'
Supp. Mem. in Supp. p. 2-28.

## A.  Initial Stop

At the outset, the Court wishes to address some concerns
that were expressed about the timeliness of Defendants stopping
the vehicle.  Approximately 20 minutes into the stop, Deputy
Johnson told Ms. Hall being "a little slow to pull over" was one
of his specific concerns.  <u>See</u> <u>supra</u>; Video 20:51:22.  This
concern was also articulated during the hearings.  A review of
the Video indicates that there was a merge lane which Defendants
chose not to cross over to stop their vehicle.  In the Court's
view, such action was proper and helped ensure the safety of both
Defendants and the Deputy as there may have been cars merging
onto the highway.  The Court finds that based on the Video,

Defendants stopped their vehicle in a reasonable time frame.
(Video 10:30:54).  Therefore, this expressed concern is of very
little negligible value in the reasonable suspicion calculus.

"[A] detaining officer must have an objectively reasonable
articulable suspicion that a traffic violation has occurred or is
occurring before stopping [an] automobile."  United States v.
Soto, 988 F.2d 1548, 1554 (10th Cir. 1993) (citation omitted).
Here, Deputy Johnson testified, and the Government argues, that
the vehicle was stopped for two reasons.  First, the vehicle was
going slower than the other vehicles on the interstate traveling
56 m.p.h. in a 75 m.p.h. zone.  (Tr. 16; Gov. Res. p. 3).
Second, the vehicle straddled the white fog line for about a
quarter of a mile when the Deputy was "just off the corner of
the[] back bumper."  (Tr. 19; Gov. Resp. p. 3).

Notwithstanding these two reasons, the Government argues
that it "need not show a violation actually occurred to justify
an initial traffic stop."  United States v. Hunnicutt, 135 F.3d
1345, 1348 (10th Cir. 1998).  Tenth Circuit cases have made it
clear that "[a]n initial traffic stop is valid under the Fourth
Amendment not only if based on an observed traffic violation, but
also if the officer has a reasonable articulable suspicion that a
traffic or equipment violation has occurred or is occurring.  Id.

The Court finds there was no traffic violation to justify
the initial stop.  First, Deputy Johnson admitted that Ms. Hall

broke no law in driving 56 m.p.h. on that portion of the
interstate.  (Tr. 16, 40-41).  The minimum and maximum posted
speeds were 45 m.p.h. and 75 m.p.h. respectively.  (Tr. 16, 40,
64).  Ms. Hall's speed of 56 m.p.h. was clearly within the
proscribed limits.  Furthermore, it was dark, wintertime, and
there was a possibility of snow on the roadway.  (Tr. 65-66).
Defendants were from out of state and may have lacked a certain
familiarity with the highway which a local resident may possess.
Therefore, based on the foregoing, the Court finds that traveling
at 56 m.p.h. in this area was not only reasonable, but also not a
violation of Utah law.

Second, based on Deputy Johnson's actions, his admissions in
testimony, and case law, the single incident of a vehicle
crossing the white fog line in this case is not a violation of
Utah law.  See U.S. v. Gregory, 79 F.3d 973 (10th Cir. 1996).

Utah Code Ann. § 41-6-61 states in pertinent part,


On a roadway divided into two or more clearly marked
lanes for traffic the following provisions apply:

(1) A person operating a vehicle:

(a) shall keep the vehicle as nearly as practical
entirely within a single lane;

Id.  The Government argues that "[u]nder the plain language of
the statute, the act of driving over the fog line for about a

quarter of a mile is in violation of the traffic code." Gov.'s
Res. p. 3-4. The Court disagrees.

The Court finds U.S. v. Gregory, 79 F.3d 973 (10th Cir 1996)
and U.S. v. Cervine, 347 F.3d 865 (10th Cir. 2003), instructive
in the instant case. In Gregory, the defendant was driving a U-
haul truck on Interstate 70 between Salina and Green River,
Utah.[4] Gregory, 79 F.3d at 975. An officer passed the defendant
while pursuing another vehicle that was exceeding the speed
limit. See id. After passing the defendant, the officer "looked
in his rear view mirror and saw defendant's U-haul truck cross
two feet into the right shoulder emergency lane of the
interstate." Id. p. 975-76. This happened a single time. See
id. p. 976. The officer testified that this was a violation of
Utah law and indicative of a sleepy or intoxicated driver. See
id. Therefore, he decided to stop the vehicle because of the
traffic violation and to investigate the driver's alertness or
possible intoxication. See id. The officer did not indicate
that there were any other driving irregularities. See id.

After checking the defendant's driver's license and rental
agreement, the officer became suspicious because of some
inconsistencies in the defendant's story. See id. Eventually,

---

[4]   Interstate 70 is the same roadway Defendants were
traveling on in the instant case. Defendants were near Elsinore,
Utah which is west of Salina. Interstate 70 bisects the United
States beginning in central Utah and ending near Baltimore,
Maryland.

the truck was searched.  The officer found marijuana and approximately 10 kilograms of cocaine.  See id. p. 977. Following arrest, the defendant sought to suppress the evidence but his motion was denied.  See id.

On appeal, the court determined that an isolated incident of a vehicle crossing into the emergency lane of a roadway is not a violation of Utah law.  See id. p. 978.  The court reached this conclusion based on an interpretation of Utah Code Ann. § 41-6-61 which is followed by Utah courts.  See id.; see e.g., State of Utah v. Bello, 871 P.2d 584, 586 (Utah App. 1994) (finding that a single instance of weaving does not constitute a violation of Utah Code Ann. § 41-6-61).  In essence, Utah's requirement that a vehicle shall operate **as nearly as practical** within a single lane, allows a court to consider other conditions which may justify an incident of moving outside of a single lane.  See Utah Code Ann. § 41-6-61; Gregory 79 F.3d at 978.

In Gregory the court concluded that the defendants instance of weaving was not a violation of Utah law because of the winding mountainous roadway and the windy weather conditions.  See id. Furthermore, given these conditions other vehicles could have also had isolated incidents of moving into the right shoulder of the roadway, "without giving rise to a suspicion of criminal activity."  Id.

The importance of the language "as nearly as practical" in Utah's statue was recently emphasized in U.S. v. Cervine, 347 F.3d 865 (10th Cir. 2003).  In Cervine, the defendant was stopped for veering over the line separating the left passing lane from the right driving lane for approximately two seconds.  See id. p. 868.  Drugs were discovered and the defendant sought to suppress the evidence.  The defendant's motion was denied.  On appeal, the defendant contested the traffic stop arguing that the stop was unconstitutional.  In support of his argument, the defendant cited to Gregory arguing that "the similarity of vehicles and driving conditions [with] Gregory requires a comparable holding." Id. p. 869.

The court disagreed and found an important distinction between Utah's statute and the applicable Missouri statute which the defendant violated.  See id. p. 870.  Missouri's statute does not allow drivers to comply with lane requirements "as nearly as practicable."  Id.  Missouri's statute has no language that creates any exceptions or justifications for improper lane travel unlike the Utah statute.  See id.  In sum, a court must "only consider vehicle and weather conditions when the underlying state statute so directs."  Id. p. 869.

In the instant case, it was dark, wintertime and the vehicle's occupants were driving on somewhat unfamiliar terrain. Deputy Johnson testified that he did not notice any traffic or

equipment violations prior to approaching the vehicle.  However, when the Deputy was "just off the corner of the [] back bumper [the car went] onto the white line and traveled on the white line for . . . about a quarter of a mile."  (Tr. 19).  When asked by the Court, Deputy Johnson admitted that it may have been his actions which led to Ms. Hall crossing onto the white line.  (Tr. 95-96).

Although the facts in this case are not exactly like those found in Gregory, the proposition that Utah law allows for consideration of conditions under the "as nearly as practical" language applies in this case.  Therefore, the Court finds it proper to consider not only the weather but the effect of Deputy Johnson's actions on Defendants' vehicle.  See Cervine, 347 F.3d at 869 ("we only consider vehicle and weather conditions when the underlying state statute so directs").  Most important in the Court's view, is the lack of any traffic or equipment violations prior to the Deputy being just off the back bumper of the Hall vehicle.  In the Court's view, under these conditions any vehicle could be subject to an isolated incident of moving onto or over the white line.  See Gregory, 79 F.3d at 978.  The driver may think they are being pulled over, move toward the shoulder, and then move back into their lane after realizing they are not being pulled over.  In essence, this is exactly what Ms. Hall thought was happening.  In the recorded video of the stop Ms. Hall is

asked why she had crossed onto the white line.  She responds by stating she thought the Deputy was pulling her over.  (Video 20:33:34).

Furthermore, the Court notes that a driver may also move over toward the right when an emergency vehicle is quickly approaching in anticipation of letting them by.  Utah Code Ann. § 41-6-76 states in relevant part:

> **Approaching emergency vehicle . . .**
> (1) Except when otherwise directed by a peace officer,
> the operator of a vehicle, upon the immediate approach
> of an authorized emergency vehicle using audible or
> visual signals under Section 41-6-14, 41-6-132, or 41-
> 6-146 or of a peace officer vehicle lawfully using an
> audible or visual signal, shall:
>      (A) yield the right-of-way and immediately move to
> a position parallel to, and as close as possible to,
> the right-hand edge or curb of the highway, . . . .

Id.

In the instant case, Deputy Johnson was approaching very rapidly in the left hand passing lane.  (Tr. 16, 42).  A driver faced with this situation could easily believe that the emergency vehicle needed to pass by quickly in response to another call. So the driver would move over toward the right.  Then, after not seeing any emergency lights, sirens, or the officer pass, move back into their lane of travel.

The Government argues that this case is factually similar to United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995).

According to the Government, in following the reasoning found in
Botero-Ospina, "the stop of the Hall vehicle . . . should be
upheld based on Deputy Johnson's observations of lane straddling
and travel well below the posted speed limit."  Gov.'s Res. p. 4.
The Court notes an important factual difference between this case
and Botero-Ospina.  In Botero-Ospina, the defendant was traveling
eastbound on Interstate 70 while the deputy "was traveling
westbound in his patrol car when he observed [the defendant's]
vehicle swerve from the outside lane, straddle the center line,
and swerve back to the outside lane."  Botero-Ospina, 71 F.3d at
785.  Thus, the deputy's actions did not have any bearing upon
the traffic violation used to justify the stop.  In the Court's
view, nothing in its decision undermines the principles laid out
in Botero-Ospina.  In fact, the Gregory court cites to Botero-
Ospina in its decision but still engages in a condition analysis
as this Court does pursuant to the "as nearly as practical"
requirement.  Therefore, while Botero-Ospina is helpful to the
instant case, it is not controlling.

    The Government also directs the Court to U.S. v. Santos, 403
F.3d 1120 (10th Cir. 2005), a recent decision of the Tenth
Circuit, offered by the Government at final argument on
Defendants' motion.  In Santos, the defendant was stopped for
speeding, doing 82 m.p.h. in a 75 m.p.h. zone.  Id. p. 1122.
After checking license and registration, the officer conducted a

search of the car based on the defendant's putative agreement to allow a search.  Id. p. 1123.  The officer was allowed to search everything but one locked suitcase in the trunk.  Id.  p. 1124. A police dog, which was called to the scene, alerted on the bag and five plastic bags containing methamphetamine were discovered. Id.  The defendant entered a conditional guilty plea and appealed the denial of his motion to suppress.  Tellingly, the Tenth Circuit affirmed despite the fact that the case had some "troubling features."  Id. p. 1122.

> [S]eeming reliance on the defendant's selective refusal of consent as a basis for reasonable suspicion, apparent inconsistencies between the district court's findings of fact based on the officer's testimony and the video tape of the traffic stop, and **relatively weak indicators of suspicious behavior.**

Id. (emphasis added).

Based on the Court's careful reading of the case, it appears that the most relevant aspect of Santos is the denial of his motion to suppress despite the presence of only weak indicators of suspicious behavior.  In essence, fairly broad deference is given to the officer's expertise in discerning suspicious activities that otherwise may go unnoticed by a lay person without specialized training.  See id. p. 1133.  However, for the initial stage of this stop there is an obvious difference with Santos.  The defendant in Santos did not dispute that he was

speeding when he was stopped.  See id. p. 1125.  Therefore, "the traffic stop was justified at its inception under objective standards."  Id.  Such is not the case in the instant action.

Based on the facts and evidence before the Court, the Court finds that the single occurrence of moving onto or over the white line, which was observed by Deputy Johnson, did not constitute a violation of Utah law.  See Gregory 79 F.3d at 978.  The Court further finds that based on the Deputy's own admission, there was no reasonable articulable suspicion that a traffic or equipment violation had occurred or was occurring.  See Hunnicutt, 135 F.3d at 1348; (Tr. 95-96).  Therefore, there was no initial justification for the traffic stop and Defendants' motion should be granted.

Notwithstanding the Court's finding that the evidence should be suppressed based upon an improper initial stop, the Court wishes to address the two other important elements in this stop: the continued detention and the dog sniff.  The Court received extensive evidence on both issues and hopes to prevent a waste of judicial resources should the District Court disagree with the Court's finding at step one.  Therefore, the Court finds it important to discuss the remaining aspects of the stop.

**B.  Detention**

Under the second part of the mandated two-part inquiry, the Court must consider "whether the action was reasonably related in scope to the circumstances that first justified the interference." Gonzalez-Lerma, 14 F.3d at 1483.  "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."  Id.  After completing these activities, an officer may detain a driver for reasons unrelated to the initial traffic stop if (1) the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring[,]" or (2) "if the initial detention has become a consensual encounter."  Id. (citations omitted); see also Terry v. Ohio, 392 U.S. 1 (1968).

In the instant case, Deputy Johnson checked the occupants licenses, ran computer checks and issued a warning citation to Ms. Hall.  (Tr. 25-38; Video 20:57:50).  Assuming arguendo that the initial stop was justified, the Court finds that these activities were proper and related to the initial stop.  See Gonzalez-Lerma, 14 F.3d at 1483.  During testimony, Deputy Johnson admitted that he accomplished the purposes of the initial stop at the time he gave Ms. Hall a warning citation.  (Tr. 80-81).  "An investigative detention may be permissibly expanded beyond the reason for its inception if the person stopped

consents to that expansion." <u>Wood</u>, 106 F.3d at 946.  The Court,
however, has no evidence before it that following the citation
the detention was consensual.  Therefore, the extension of the
detention is proper only if the detaining officer at the time of
the detention has "a particularized and objective basis for
suspecting the particular person stopped of criminal activity."
<u>United States v. Lambert</u>, 46 F.3d 1064, 1069 (10th Cir. 1995)
(quoting <u>Uinted States v. Bloom</u>, 975 F.2d 1447, 1456 (10th Cir.
1992)) (quotations omitted); <u>Gonzalez-Lerma</u>, 14 F.3d at 1483; <u>see
also</u> <u>United States v. Lee</u>, 73 F.3d 1034, 1039 (10th Cir. 1996)
("When the driver has produced a valid license and proof that he
is entitled to operate the car, he must be allowed to proceed on
his way, without being subject to further delay by police for
additional questioning.") (citation and quotations omitted).

The Government lists ten factors, along with some "other
minor details" in support of Deputy Johnson's determination of
reasonable suspicion warranting detention of Defendants:

> (1) Ms. Hall's erratic driving which includes
> straddling the fog line and going 56 m.p.h. in a 75
> m.p.h. zone; (2) the smell of air freshener, which
> Deputy Johnson said was "sickening" initially but later
> dissipated; (3) Ms. Hall's immediate inquiry whether
> she had been speeding when she had been traveling under
> the speed limit; (4) the ashtray and ashes dumped on
> the floor of the vehicle which were cleaned up when
> Deputy Johnson returned to the car after speaking with
> Ms. Hall; (5) Ms. Hall's extreme nervousness and
> shaking; (6) Ms. Hall's inability to produce her
> drivers license although it was in her purse; (7) the

fact that Ms. Hall did not know whose car she was
driving; (8) circumstances concerning ownership of the
vehicle including the fact that it was not registered
to either Defendant; (9) prior drug charges on both
Defendants' criminal history information; (10)
Defendants were traveling on a major drug trafficking
corridor from Law Vegas to Denver.

Gov. Res. p. 5-6.  The "other minor details" include pulling the

vehicle over with a quick jerk, the name discrepancy on the

information given to locate Hall's drivers license information,

and Ms. Hall's response when asked about drugs in the vehicle.

See id. p. 6.  Ms. Hall answered "not that I know about," as

opposed to "no."  See id.; (Tr. 30).

The Court considers these in the order listed.  In the final

analysis, however, the question is whether taken as a whole, do

the factors support a finding of reasonable suspicion.  See

United States v. Arvizu, 534 U.S. 266, 274 (2002); United States

v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994).  The Court

cannot simply employ a divide-and-conquer strategy in regard to

the listed factors.  As the Supreme Court has admonished, to do

so would be legal error.  Arvizu, 534 U.S. at 274; U.S. v.

Santos, 403 F.3d 1120, 1133 (10th Cir. 2005).  Common sense and

ordinary human experience are to be employed, see Untied States

v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994), and

deference is to be given for a law enforcement officer's ability

to distinguish between innocent and suspicious actions.  See

United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir.

1004).  However, inchoate suspicions and unparticularized hunches
do not provide reasonable suspicion.  See United States v.
Fernandez, 18 F.3d 874, 878 (10th Cir. 1994).  "Some facts must
be outrightly dismissed as so innocent or susceptible to varying
interpretations as to be innocuous."  Lee, 73 F.3d at 1039; Reid
v. Georgia, 448 U.S. 438, 441 (1980).

### 1. Ms. Hall's Erratic Driving

The Court discussed Ms. Hall's driving at length supra,
however the following is relevant to this stage of the reasonable
suspicion calculus.  The Government points to two parts of Ms.
Hall's alleged erratic driving, first, straddling the fog line
and second, driving 56 m.p.h. in a 75 m.p.h. zone.  By Deputy
Johnson's own admission there was nothing illegal about going 56
m.p.h.  (Tr. 16. 40-41).  Deputy Johnson was concerned about the
slower speed but the Court finds going slow is not an indication
of suspicious criminal activity.  There are many innocent
explanations for going slower than the speed limit.  For example,
darkness and winter weather conditions may be reason for a
motorist to slow down.  (Tr. 65-66).  Plus, there is not much
degree of suspicion that attaches to an individual who is going
slower than the speed limit as long as they are within the posted
limits.  See United States v. Sokolow, 490 U.S. 1, 10 (1989).  If
it were otherwise, countless numbers of senior drivers, who often
drive slower, would be subject to random searches.  Therefore,

the weight given to going slow in this case is akin to that of a feather.

Weaving into other lanes is certainly more probative of suspicious or illegal activity than going slow.  Weaving may indicate the presence of alcohol or sleepiness and has been the basis for proper traffic stops.  <u>See</u> <u>Cervine</u>, 347 F.3d at 868; <u>U.S. v. Largo-Montenegro</u>, 943 F.2d 58 (10th Cir. 1991).  Deputy Johnson testified that one reason for pulling Defendants over was to check for a drowsy or intoxicated driver.  (Tr. 17).  However, based on Deputy Johnson's own admission that his behavior may have led to the weaving, this factor must be somewhat discounted. (Tr. 95-96).  Accordingly, the Court finds that Ms. Hall's alleged erratic driving, "while not inconsequential, is insufficient to be given much weight in the reasonable suspicion calculus." <u>Santos</u>, 403 F.3d at 1128.

### 2. The Smell of Air Freshener

Deputy Johnson testified that the smell from the air freshener in the car was "a sickening smell if I had to sit in that car and smell that for very long."  (Tr. 91).  The air freshener was some type of an orange scent.  (Tr. 20). Defendants argue that "millions of drivers all over the nation also have air freshener in their cars, and the purpose of the air freshener is consistent with the fact that the occupants were driving across country and due to the observation of cigarette

ashes, were likely smoking in the vehicle." Def.'s Supp. Mem. p. 23.

While this is certainly a reasonable explanation, in the Court's view, it still fails to account for the fact that the scent was quite strong when the car was initially pulled over. To have such a strong smell, the air freshener would need to be sprayed in close proximity to the stop. While there are varying reasons for spraying air freshener, it appears Defendants were trying to cover up some other scent. What that other scent was is unknown. Tellingly, however, Deputy Johnson failed to notice any odor of a controlled substance.

Also of note, is the fact that the windows were down, and the wind was blowing as can be observed from the car's exhaust in the video. These two things would contribute to the dissipation of the scent between the initial contact of Deputy Johnson and the second contact with Mr. McLaughlin approximately 15 minutes later.

Based on the Deputies' testimony and other evidence before the Court, the Court finds the "sickening" orange scent one of the most indicative factor of genuinely suspicious behavior. In the Court's view this arises from the strength of the smell, the time frame in which it would have been sprayed to be that strong, and the dissipation of the scent over the course of the stop.

### 3.  Ms. Hall's Immediate Inquiry About Speeding

When initially stopped, Ms. Hall asked if she had been speeding although she had been going only 56 m.p.h.  The Court finds this to be a relatively weak factor given the propensity of individuals to ask this question when stopped.  Although someone may ask "what did I do wrong" as testified by Deputy Johnson, (Tr. 80), the fact remains that speeding is one of the most frequent violations on the highway.  Therefore, based on common sense this question seems to be very common and fairly innocuous. See Melendez-Garcia, 28 F.3d at 1052.  Finally, any possibility of this indicating impairment, see Tr. 22, was alleviated when both Ms. Hall and Mr. McLaughlin passed a series of tests given by Deputy Johnson.

### 4.  The Ashtray Dumped on the Floor

Deputy Johnson noticed the car's ashtray and the ashes inside it had been spilled on the floor.  The Deputy saw cigarette butts, but nothing that looked like it had come from any controlled substances.  (Tr. 52, 96).  Later they were cleaned up by Mr. McLaughlin.

Deputy Johnson testified that Defendants may have been trying to hide something with the way the ashes were dumped on the floor.  While this is certainly possible, the Deputy failed to notice anything illegal with the ashes.  An equally plausible explanation is that Mr. McLaughlin may have been smoking so he

had the ash try near him.  Then, when Ms. Hall was looking for
her license she bumped it knocking the ashtray and its contents
onto the floor.

The Government also points to the cleaning up of the ashes
as indicative of suspicious behavior.  The Court finds this to be
fairly innocuous.  Mr. McLaughlin was sitting and waiting in the
vehicle during the questioning of Ms. Hall.  With not much else
to do but wait, it does not seem suspicious to the court that he
cleaned up the ashes on the floor.  Had the Deputy observed the
remnants of a controlled substance in the ashes, then this factor
would have carried much more weight than it does in the Court's
analysis.

### 5.  *Ms. Hall's Extreme Nervousness and Shaking*

Based on the Court's review of the video, it does appear
that Ms. Hall exhibited some nervousness and shaking.
Nervousness, however, is a common and perhaps even natural
reaction to an encounter with police.  "Only extraordinary and
prolonged nervousness can weigh significantly in the assessment
of reasonable suspicion."  Santos, 403 F.3d at 1127.

The Court finds that Ms. Hall's nervousness was not
extraordinary or prolonged enough to weigh significantly in the
reasonable suspicion calcululus.  After initially talking with
Deputy Johnson Ms. Hall seems to have calmed down.  Her voice
does not exhibit any extraordinary nervousness, and she answers

the Deputy's questions quite naturally.  At one point, Ms. Hall even appears to have a conversation on her cell phone while sitting in the Deputy's vehicle.  Based on the foregoing, the Court finds that while not inconsequential, Ms. Hall's nervousness is insufficient to be given much weight.  See id. p. 1128.

   *6.  Ms. Hall's Inability to Produce Her Drivers License*

Deputy Johnson testified that he found it unusual that Ms. Hall could not locate her identification since "most people know where their identification is."  (Tr. 22).  Eventually the license was discovered in her purse.  Although an individual can forget where their license or identification is, or perhaps even lose their purse, it does seem somewhat strange to the Court that Ms. Hall would not know that her license was in her purse. Presumably, she had placed it in there at some point prior to the stop.  Accordingly, the Court finds this factor indicative of suspicious behavior.

   *7.  Ms. Hall Not Knowing Whose Car She Was Driving &*

     *8.  Circumstances Concerning Ownership of Vehicle*

The Court considers these two factors together because they are related.  Ms. Hall did not know the vehicle's owner. However, she told the Deputy that it had been borrowed from a friend of Mr. McLaughlin.  When Mr. McLaughlin was questioned, he told Deputy Johnson the same thing.  The car was borrowed from a

friend of his and he provided the name of the individual who appeared on the registration.  Both Defendants also gave consistent stories to the Deputy when questioned about their whereabouts and their travel plans.

The consistency in Defendants' stories is very important in the Court's view, because it distinguishes this case from the numerous cases where Defendants give inconsistent stories or implausible travel plans which add to the suspicion of officers. See e.g., Santos, 403 F.3d at 1130-32 (pointing to the "vague, evasive, or inconsistent answers" given by the defendant to questions as suspicious); United States v. Kopp, 45 F.3d 1450, 1453-54 (10th Cir. 1995); United States v. Sanchez-Valderuten, 11 F.3d 985, 989 (10th Cir. 1993).

The Government alleges that drug traffickers often use vehicles not registered to them.  See Gov. Res. p. 6.  Therefore, these factors weigh heavily in the reasonable suspicion calculus. The Court does not disagree with the Government's assertion that drug traffickers often use vehicles not registered to them.  In the instant case, however, the Court finds the weight these factors carry is substantially weakened by the consistency of the answers given by Defendants.  There is nothing suspicious, in the Court's view, about borrowing a vehicle to go on a vacation. This is especially true when your vehicle is being repaired, as Mr. McLaughlin told the Deputy in this case.  See Video 20:45:56.

### 9.  Prior Drug Charges

Both Ms. Hall and Mr. McLaughlin had prior drug charges which appeared on the criminal history information.  (Tr. 33).  Mr. McLaughlin was also on probation.  (Tr. 33).  In the Court's view, this is the most powerful reason the Government offers for finding reasonable suspicion.  The Tenth Circuit has held that a prior criminal history per se is insufficient to create reasonable suspicion.  See United States v. Sandoval, 29 F.3d 537, 542 (10th Cir. 1994).  But, in connection with other factors, a criminal history, can significantly contribute to the reasonable suspicion calculus.  See Santos, 403 F.3d at 1132-33.  "Moreover, when the individual lies about having a criminal history, the inference of wrongdoing is all the more powerful."  Id. at 1133.

In the instant case it does not appear that either Defendant deliberately lied to cover up prior criminal history information.  There was some confusion with Ms. Hall as to what was her prior history, but that was eventually cleared up.  Nevertheless, the Court does find that the past criminal records, especially the fact that Mr. McLaughlin was on probation, important to the reasonable suspicion calculous.

###### 10.  *Traveling on a Major Drug Trafficking Corridor*

The Government next contends that Defendants were traveling on a major drug trafficking corridor, I-70, between Las Vegas and Denver.  Although travel between drug sources and destinations can be considered, the weight of this factor is usually quite weak.  The Tenth Circuit has stated that traveling from a source city is, "at best, a weak factor in finding suspicion of a crime."  <u>United States v. Williams</u>, 271 F.3d 1262, 1270 (10th Cir. 2001).  "If travel between two of the country's largest population centers is a ground on which reasonable suspicion may be predicated, it is difficult to imagine an activity incapable of justifying police suspicion and an accompanying investigative detention."  <u>Santos</u> 403 F.3d at 1132.  Accordingly, the Court finds this factor to be a weak indicator of criminal activity.

###### 11.  *Other Minor Details*

Finally, the Government points to "other minor details" as support for Deputy Johnson's reasonable suspicion.  These include pulling the vehicle over with a quick jerk, the name discrepancy on the information given to locate Ms. Hall's drivers license information, and the answers given when asked about drugs in the vehicle.  Gov. Res. p. 6.

After reviewing the video of the stop, the Court fails to find anything very uncharacteristic about Ms. Hall's actions in pulling over the vehicle.  The Court does not notice anything

that it would characterize as a "quick jerk."  Perhaps, this minor detail is in reference to when Ms. Hall pulls the vehicle off the shoulder and then onto the dirt.  However, even this move does not appear jerky.  Instead, it appears to be an attempt to make certain that she had pulled off the road far enough to ensure the Deputy's safety.  See Video 20:31:16.

The Court further finds that after reviewing the video there did not appear to be any attempt by Ms. Hall to mislead the Deputy by giving a false name.  She helped the Deputy by providing her maiden name, middle name, and social security number.  The Court finds that based on her cooperation, the trouble finding Ms. Hall's drivers licence information is a relatively weak factor.

Finally, the Court finds that Ms. Hall's answer is somewhat indicative of suspicious behavior.  Mr. McLaughlin also answered in the same manner.  These answers do demonstrate some intent to distance an individual from drugs in a vehicle.

### Totality of the Circumstances

The decisive question is, whether taken as a whole, do the factors offered by the Government support a finding of reasonable suspicion.  See United States v. Arvizu, 534 U.S. 266, 274 (2002); United States v. Fernandez, 18 F.3d 874, 878 (10th Cir. 1994).

As mentioned supra, the Government offers Santos in support of its argument.  The Santos court affirmed the denial of a motion to suppress despite the presence of only weak indicators of suspicious behavior.  See 403 F.3d at 1122.  The Court, however, declines to read Santos broadly, as holding that every time there is the presence of numerous individual weak factors that these equate to a finding of reasonable suspicion.  Such a broad reading would strip the Fourth Amendment of many important protections.  Just as the Supreme Court has warned against a divide-and-conquer strategy, see Arvizu, 534 U.S. at 274, so too, in the Court's view, should courts be wary to adopt a de facto combine-and-conquer strategy.  See United States v. Wood, 106 F.3d 942 (10th Cir. 1997) (concluding that there was no reasonable suspicion justifying a search arising from an aggregation of factors).

Although it is possible for innocuous factors to add up to a reasonable suspicion, such is not the case in the instant stop. After removing the factors that must be disregarded or that are mere paperweights, the Court finds that what is left is of limited significance and not enough to equate to a finding of reasonable suspicion.  See id. at 948.  At one point during the stop Deputy Johnson tells Ms. Hall that "I do believe there's something wrong here don't know yet what it is."  (Video 20:55:27).  This seems indicative of the classic case where an

officer is following inchoate suspicions and unparticularized hunches which do not provide reasonable suspicion.  <u>See</u> <u>Fernandez</u>, 18 F.3d at 878.

Based on the facts and evidence before the Court, the Court finds that there was not a reasonable suspicion justifying the continuing detention and eventual search of the vehicle.  <u>See</u> <u>Wood</u>, 106 F.3d at 948.  Accordingly, because Defendants' vehicle was detained without reasonable suspicion, the evidence of illegal drugs is tainted by the unlawfulness of the detention and must be suppressed.  In the Court's view, Defendants should have been free to go following receipt of the warning citation issued by Deputy Johnson.

**C.  Canine Sniff**

As mentioned <u>supra</u>, the K-9 unit that came at Deputy Johnson's requests consisted of Deputy Todd Gardner, and his dog, Vader.  Vader was rescued by Deputy Gardner from the Humane Society in Salt Lake City and then certified on October 17, 2003 to locate controlled substances.  Unfortunately, there are no documentation or written records of Vader's training prior to certification.  (Tr. 110, 148).  Before the instant stop, Vader was deployed 59 times.  (Tr. 122-23).  Of those 59 deployments, 31 times Vader indicated and narcotics were found, 21 times Vader did not indicate to the presence of narcotics, and on 7

occasions, Vader indicated and no controlled substances were found.  (Tr. 122-27).

Of importance to the current search is also the fact that earlier in the day, Vader and Deputy Gardner performed a search where 700 pounds of marijuana was recovered from a trailer.  (Tr. 169-70).  Vader searched the outside of the trailer and was later taken into it for a further search.  (Tr. 169-70).  Deputy Gardner wore his uniform and gloves during that search.  (Tr. 171).

The Court heard extensive testimony about the training of police dogs and the validity of the sniff in this case from two experts.  Bobby Mutter, for Defendants, and Wendell Michael Nope for the Government.  Mr. Mutter is a retired commander and police officer that "has worked extensively in the training and instruction of K-9 police dogs and their handlers all over the country."  Def.s' Supp. Mem. p. 10; (Tr. 183-86).  Mr. Nope is a Utah State Police Officer and a K-9 training supervisor at the police academy for Utah.  Deputy Gardner, Vader's handler, also testified concerning the aspects of this deployment and search.  The Court outlines testimony received from the expert witness below.

### 1. Testimony of Bobby Mutter

Mr. Mutter testified concerning the following:

(I).  One the most, if not the most, important parts of dog
detection is the selection of the dog itself.  (Tr. 192).
According to Mr. Mutter, he may test 50 dogs before discovering
two that are acceptable to train.  This is due to the fact that
the dog must have innate characteristics of a high motivation and
high retrieve drive with a desire to please a keeper.  (Tr. 193).

(II).  At the beginning of training a dog, the trainer does
75% of the work and the dog 25%.  (Tr. 196).  Over time the dog
becomes more competent until a handler can back off essentially
letting the dog do most of the work.  (Tr. 196-98).  This is
important, because if a handler is too involved in a search the
dog will misread the handler and falsely alert.  (Tr. 198-201).
The more a handler participates, the more likely you are to have
a false alert.  (Tr. 199).  Once a dog has been certified, the
handler should not encourage the dog after the first command to
search.  (Tr. 204).  Very subtle things, such as voice tones, eye
movement, and hand gestures can lead a dog to indicate.  (Tr.
201).

(III).  In training dogs to search officers often use
something such as a toy for a reward.  Whatever item is used it
should be odorless, because a dog may alert to the reward rather
than the presence of drugs.  (Tr. 206, 239-40).  A reward should
only be given when the dog alerts and the search is confirmed.
Otherwise, a preconceived notion that drugs are inside something

36

may be created by showing a dog the reward before a search is finished. (Tr. 209). Such a notion would decrease accuracy and skew results. (Tr. 207-08). During the search, a handler should not bang or hit on a vehicle because this may solicit an alert. (Tr. 207-08). High pitch noises should also be avoided because they may solicit a response. (Tr. 211, 241). Finally, even trained and certified dogs just do not function on the side of a roadway. (Tr. 209).

In reference to this specific case, Mr. Mutter viewed the video of the stop and testified as follows: Vader was not really searching. (Tr. 212). Instead, Vader was simply "following the handler's key." Vader was distracted and not focused. (Tr. 212). At the point where the dog turns in a circle, Gardner taps on the vehicle, the dog whimpers and wags his tail is not an alert, but probably frustration. (Tr. 212). This frustration may stem from the fact that "[t]he handler is trying to talk [the dog] into an alert." (Tr. 213). Mr. Mutter never saw an indication of a final response nor an indication that there were drugs in the car. (Tr. 213, 215-16).

Mr. Mutter gave the opinion that this was one of the worst searches he has ever seen from the hundreds of searches he has witnessed. (Tr. 217). This is because of how suggestive Deputy Gardner was in soliciting a response. The search had no degree

of reliability and the officer was doing 75% of the work.  (Tr. 218, 250).

Finally, the Court notes that Mr. Mutter testified that Wendell Nope's opinion concerning matters of K-9 drug detection should be "given some respect and authority."  (Tr. 222).

*2. Testimony of Wendell Nope*

Mr. Wendell Nope, the Director of the POST Police Dog Certification Program, testified as follows:

(I).  He certified Vader on the 17th of October, 2003 and identified in court the certificate he prepared.  (Tr. 276).  Mr. Nope has been involved in the training of approximately 4000 dogs.  (Tr. 276).  It is possible for a dog to be induced into indicating or to indicate on a lingering odor from controlled substances that are no longer present.  (Tr. 285, 334-38). Handlers are trained to do certain things which help prevent false positives.  (Tr. 298).  One item that is required to determine the reliability of a dog is an extensive training record.  (Tr. 296).  The term commonly used to describe a false positive in Utah is false indication, i.e. when a dog indicates and there are no drugs discovered.  (Tr. 300).  It is possible for a dog to indicate on a lingering odor from controlled substances that are no longer present.  (Tr. 339-40).

(II).  Specifically, in reference to the stop, Mr. Nope testified as follows: Mr. Nope reviewed the video of the stop in

court and gave a description of what was occurring.  (Tr. 280-
282).  Mr. Nope described the changes in behavior of Vader.  (Tr.
281).  This included whining, light barking and excitement.  Mr.
Nope testified that the dog indicated and gave the handler a
signal that it smelled the odor of narcotics.  (Tr. 283).  Vader
was distracted at certain points during the search but that is
acceptable.  (Tr. 283).  However, Deputy Gardner's techniques to
get the dog's attention and refocus him on the task at hand were
proper.  Deputy Gardner did not induce the dog into indicating
because he used the same behavior all around the vehicle.  (Tr.
285).  The performance of Vader was suitable or adequate "but
not more."  (Tr. 287).  Although, if Mr. Nope only saw what was
on the video he would not certify Vader.  (Tr. 308).

Based on the testimony before the Court, the Court finds the
following.

1.  Notwithstanding the differences between the expert's
opinions, the Court finds both expert witnesses to be credible.

2.  The Government argues that "the only conclusion to be
drawn from the testimony is that K-9 Vader indicated the presence
of narcotics in the Hall vehicle, thus giving Deputy Johnson
probable cause to search the vehicle for narcotics."  Gov. Res.
p. 10; see also United States v. Ludwig, 10 F.3d 1523, 1527 (10th
Cir. 1993) (citing cases which held "that a dog alert without
more gave probable cause for searches and seizures").  However,

the Government's own witness testified that it is important to have an extensive training record to determine the reliability of a dog.  (Tr. 296).  An extensive record of Vader's training is unavailable.  This fact, along with his performance record in the field, see supra, leads to serious questions about Vader's reliability as a search dog.  Unfortunately, the instant search does not help Vader's reliability as a search dog either.

Regarding the instant search, Mr. Mutter testified that this was one of the worst searches he had ever seen.  (Tr. 217).  Mr. Nope called this search adequate or suitable, but admitted that if he had only seen the search in this video, he would not certify Vader.  (Tr. 287, 308).

There is also the distinct possibility that Vader picked up on the scent from Deputy Gardner's gloves that had been worn in a search earlier that day.  (Tr. 169-70).  Prior to the instant deployment, Vader and Deputy Gardner were involved in a search where a substantial amount of marijuana was discovered.  Deputy Gardner testified that he wore the same gloves in that search as he did during the instant search.  (Tr. 171).  Based on the testimony of both experts, there could have been some scent transfer from the marijuana to the gloves.  This scent could have been detected by Vader during the instant search.

Based on the foregoing, the Court finds that the instant search by Vader was not reliable.  Therefore, there was no

probable cause to enter the vehicle and search.   Compare Ludwig,
10 F.3d at 1527.   Accordingly, even if the District Court
disagrees with this Court concerning the first two inquiries of
the instant stop, the evidence should still be suppressed because
there was not probable cause to enter the vehicle following the
dog sniff.

### III.   RECOMMENDATION

Based on the foregoing, the Court HEREBY RECOMMENDS that
Defendants' Motion to Suppress be GRANTED.

Copies of the foregoing report and recommendation are being
mailed to all parties who are hereby notified of their right to
object.   The parties must file any objection to the Report and
Recommendation within ten days after receiving it.   Failure to
object may constitute a waiver of objections upon subsequent
review.

DATED this __15th__ day of June, 2005.

BY THE COURT:

BROOKE C. WELLS
United States Magistrate Judge